1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                   FOR THE EASTERN DISTRICT OF CALIFORNIA

9   JOHN S. TINKER,

10              Petitioner,                    No. CIV S-06-726 MCE KJM P

11        vs.

12   THOMAS E. CAREY, Warden,                  ORDER AND

13              Respondent.                    FINDINGS AND RECOMMENDATIONS

14   _____/

15              Petitioner is a state prison inmate proceeding pro se with a petition for a writ of

16   habeas corpus under 28 U.S.C. § 2254, challenging his Sacramento County conviction for

17   voluntary manslaughter and the enhancement for use of a knife.  His petition alleges

18   prosecutorial misconduct and sentencing error.

19   I.  Background

20              This court relies on the state Court of Appeals' description of the facts as

21   developed at trial, which reflects this court's reading of the record:

22              Defendant and Mary Elizabeth "Beth" Tinker had been married for
             approximately 26 years at the time of her death.  They met in the
23              1970's while both were students at Stanford University.  They had
             four children–Adam, Julie, Andrew, and Laura.  Defendant and
24              Beth lived in Elk Grove with their two youngest children, 17-year-
             old Andrew and 15-year-old Laura.  Julie was attending Stanford
25              University, while Adam, his wife Toni, and their baby lived
             approximately five miles away from the Tinkers.
26

                                           1

Toni, who had known the Tinkers for five years and visited them almost every day, testified about the state of the Tinker marriage. Toni described the Tinkers' relationship during the month of September as "very troubled." Beth argued with defendant about his lack of a job, his failure to take psychiatric medication, and her lack of sleep because he was up all night.  When Toni first met defendant, he was fairly good-natured.  However, as the years progressed, defendant began believing that his coworkers were trying to poison him and that people were in the attic of his house.

On September 29, 1999, Toni went to the Tinker residence for a short visit.  Beth, a music teacher, had arranged for Toni to have a music lesson the next morning and for the two of them to have lunch together.

The next morning, Toni called Beth to postpone their piano lesson because her son was sleeping.  Toni called again at 11:00 a.m. and talked to Beth about when she would come over.  Toni did not hear any fear or concern in Beth's voice.

At approximately noon, Toni received a telephone call from defendant asking her to call the sheriff's department because Beth was dead.  Toni questioned defendant but he repeated himself and hung up the telephone.  After unsuccessfully trying to call him back, Toni called 911.

At approximately 12:15 p.m., defendant rang the doorbell of his next-door neighbor, Anne Rooney.  Covered in blood, defendant asked Ms. Rooney to call 911 and the fire department, stating that he had just fought with Beth.  Ms. Rooney called 911.  Her father, Francis Rooney, went outside and spoke with defendant. Defendant told Mr. Rooney that he had killed Beth, explaining he had been afraid she would make him leave, which upset him.

Gary Huizar was the first sheriff's deputy to arrive at the Tinker residence.  Upon entering the house, Deputy Huizar saw Beth lying on the floor with a kitchen knife embedded in her chest.  Blood was everywhere.

Deputy Huizar ran outside "to secure" defendant and saw that Deputy Steven Hickey had arrived.  Deputy Hickey accompanied defendant to the Sacramento County Medical Center where he received treatment for cuts to his hand.  En route, defendant told Deputy Hickey that he did not know why his wife treated him like that, that she did not believe him about his medical problems, and that he had been on his way to "Kaiser" when their argument began.

According to the doctor who performed the autopsy, Beth died from stab wounds to her chest and back.  She had three nine-inch stab wounds: one through her heart into her back, a second through

a portion of her heart, and a third that severed her pulmonary artery. In addition to these fatal injuries, Beth suffered multiple wounds to the back and palm surfaces of her hand, which were caused by blocking the knife or grabbing the blade. In total, Beth had approximately 37 wounds on her body. At the time of her death, Beth was five feet five inches tall and weighed 159 pounds. Defendant was six feet two inches and weighed 307 pounds.

Defendant testified on his own behalf. He recalled past violent incidents that Beth had perpetrated. One occurred in July 1975 when Beth struck him in the neck, injuring him. The second occurred in 1998 while they were arguing about disciplining their children. Beth pulled out a machete that was in the kitchen drawer and slammed it down on the counter.

Defendant also testified about his work environment and problems he was having there. In 1989 defendant began working for Caltrans. In 1995 a coworker physically and verbally assaulted him. After the incident, defendant noticed that someone had been using his work computer without permission. By 1998 he began having extreme allergic reactions to the dust in his workplace. He became nervous and wore gloves to work. In March 1999 defendant was given disability leave from Caltrans.

In February 1999 defendant became concerned about occurrences outside his workplace. He observed people following him while he was driving. He once saw burnt chicken feathers on his porch. He thought people were entering his house without permission and changed the locks on his house.

During this time period, defendant began treatment at Kaiser Hospital's psychiatric department for depression and severe paranoia. In March or April 1999 he was prescribed trazodone and Paxil. Trazodone made him extremely drowsy and gave him violent nightmares. On April 30, 1999, he had a dream that left him feeling as though he could kill somebody. Beth called the sheriff's department and defendant was taken to the Sacramento County Mental Health Center but was released 16 hours later.

Defendant went to live with his mother and returned home in June. He was no longer taking any psychiatric medications, which was a point of contention between Beth and him.

During the summer, defendant completed an outpatient course at Kaiser to help him deal with his paranoia. At the request of Beth and his doctor, he began taking Paxil again. By late September, he felt terrible and had developed severe muscle cramps that kept him up all night. He stopped taking the medication.

Defendant described what happened on the day that Beth was killed. That morning, he drove his daughter Laura and her friend

to school.  When he arrived back home at approximately 8:00 or 8:15 a.m., he made breakfast and he and Beth had a "nice conversation."  They both started doing chores around the house. Defendant then got ready to go to Kaiser to pick up his diabetes medication.  Beth came down the stairs and was "very mad" at him.  He went to the staircase and Beth "started in on [him]."  She yelled and told him he was no good for their children.  Defendant saw a flash of metal that turned out to be a knife.  He remembered "tussling" with Beth and being slashed in the arm.  He has tried to remember what happened but has no explanation.

Dr. Charles Schaffer examined defendant in 2000 and 2002.  He diagnosed defendant as suffering from bipolar I disorder with psychotic features.  Bipolar disorder is characterized by periods of depression and manic episodes, sometimes occurring simultaneously.  Symptoms of mania include increased speed of talking, tangential thinking, and grandiose thoughts.  Psychotic features include seeing or hearing things that do not exist.  Dr. Schaffer believed that defendant was experiencing paranoid delusions for several months in 1999.  Based on interviews with defendant and a review of his medical records, Dr. Schaffer opined that defendant was in a manic state on the day Beth was killed.

Lodged Document (Lodg. Doc.) No. 3 at 2-6 (footnote omitted).

II.  Standards Under The AEDPA

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  Also, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").[1]  It is the habeas

---

[1]  Title 28 U.S.C. § 2254(d) establishes a precondition to federal habeas relief, not grounds for entitlement to habeas relief.  Fry v. Pliler, 551 U.S. 112, 119-20 (2007).

1  petitioner's burden to show he is not precluded from obtaining relief by § 2254(d).  See

2  Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

3          The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are

4  different.  As the Supreme Court has explained:

5          A federal habeas court may issue the writ under the "contrary to"
           clause if the state court applies a rule different from the governing
6          law set forth in our cases, or if it decides a case differently than we
           have done on a set of materially indistinguishable facts.  The court
7          may grant relief under the "unreasonable application" clause if the
           state court correctly identifies the governing legal principle from
8          our decisions but unreasonably applies it to the facts of the
           particular case.  The focus of the latter inquiry is on whether the
9          state court's application of clearly established federal law is
           objectively unreasonable, and we stressed in Williams [v. Taylor,
10         529 U.S. 362 (2000)] that an unreasonable application is different
           from an incorrect one.

11

12 Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the

13 law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply

14 fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8

15 (2002).

16         The court will look to the last reasoned state court decision in determining

17 whether the law applied to a particular claim by the state courts was contrary to the law set forth

18 in the cases of the United States Supreme Court or whether an unreasonable application of such

19 law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S.

20 919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial

21 of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court

22 must perform an independent review of the record to ascertain whether the state court decision

23 was objectively unreasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other

24 words, the court assumes the state court applied the correct law, and analyzes whether the

25 decision of the state court was based on an objectively unreasonable application of that law.

26 /////

1    "Clearly established" federal law is that determined by the Supreme Court.

2    Arredondo v. Ortiz, 365 F.3d 778, 782-83 (9th Cir. 2004).  At the same time, it is appropriate to

3    look to lower federal court decisions as persuasive authority in determining what law has been

4    "clearly established" and the reasonableness of a particular application of that law.  Duhaime v.

5    Ducharme, 200 F.3d 597, 598 (9th Cir. 1999); Clark v. Murphy, 331 F.3d 1062 (9th Cir. 2003),

6    overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63 (2003); cf. Arredondo, 365 F.3d at

7    782-83 (noting that reliance on Ninth Circuit or other authority outside bounds of Supreme Court

8    precedent is misplaced).

9    III.  Prosecutorial Misconduct–Vouching (Ground One)

10         Near the end of his summation, the prosecutor said:

11         In the end as the prosecutor I have a responsibility to present
           evidence that supports all of the elements of this crime.  I've done
12         exactly that in this case.  This evidence clearly establishes that the
           defendant intentionally and unlawfully killed his wife, Beth Tinker.
13

14   RT 485.  Although trial counsel did not object, appellate counsel challenged this on appeal.  The

15   Court of Appeal found the issue was waived by counsel's failure to object and that the challenge

16   also failed on the merits.  Lodg. Doc. 3 at 7-8.  Respondent does not rely on the waiver, however,

17   but simply addresses the merits of petitioner's claim; he has thus waived any reliance on a

18   procedural bar.  Docket No. 8 at 11, 19-22[2]; Trest v. Cain, 522 U.S. 87, 89 (1997).  Nevertheless,

19   the court declines to raise the question of waiver sua sponte because it is simpler to deny the

20   claim on the merits.  Windham v. Merkle, 163 F.3d 1092, 1100 (9th Cir. 1998); see Lambrix v.

21   Singletary, 520 U.S. 518, 525 (1997).

22   /////

23   /////

24   /////

25

26         [2]  The court refers to the page numbers assigned by its ECF system.

The Court of Appeal analyzed the merits of the claim in this manner:

> In this case, the prosecutor's statements were his conclusion that he had sustained his burden of proving that defendant committed murder. Put into its proper context, the statements were simply one in a series of comments by which the prosecutor explained his burden of proving defendant guilty of murder beyond a reasonable doubt. Toward the beginning of his argument, the prosecutor stated it was his ". . . responsibility to present to you evidence that supports the burden of proof that I have to meet, which is proof beyond a reasonable doubt. The evidence supporting this case must prove beyond a reasonable doubt the defendant committed this homicide." Shortly thereafter, he told the jurors it was their responsibility "to consider the elements of the crime charged and the lesser-included offenses to those charges." The prosecutor then described the elements of murder and recounted the evidence that he believed supported the existence of those elements. He then discussed why he believed the facts of this case did not show that defendant acted in self-defense and why the evidence did not support a verdict of voluntary manslaughter. He then discussed defendant's bipolar disorder and whether it affected defendant's ability to form the specific intent to kill or premeditate. Following these comments, the prosecutor made the statements that defendant now challenges on appeal.
>
> As this review of the closing argument demonstrates, the prosecutor did no more than argue broadly the law and facts of the case, comment on the actual state of the evidence, and "urge whatever conclusions he deem[ed] proper. There was no misconduct.

Lodg. Doc. 3 at 8-9 (internal citations and quotations omitted).

The standard of review for prosecutorial misconduct in federal habeas cases is "the narrow one of due process, and not the broad exercise of supervisory power." Donnelly v. DeChristoforo, 416 U.S. 637, 642 (1974). To prevail on a claim of prosecutorial misconduct, petitioner must show that the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process" or by manipulating or misstating the evidence or implicating defendant's specific rights. Darden v. Wainwright, 477 U.S. 168, 181, 182 (1986); see also Hovey v. Ayers, 458 F.3d 892, 923 (9th Cir. 2006). "To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of

/////

1  the defendant's rights to a fair trial." <u>Greer v. Miller</u>, 483 U.S. 756 (1987) (internal citation,

2  quotation omitted).

3        Federal courts have defined and then condemned a practice they have labeled

4  vouching:

5        Vouching consists of placing the prestige of the government
   behind a witness through personal assurances of the witness's
6        veracity, or suggesting that information not presented to the jury
   supports the witness's testimony.
7

8  <u>United States v. Necoechea</u>, 986 F.2d 1273, 1276 (9th Cir. 1993).  Courts have found improper

9  vouching when a prosecutor argued that the officers would not lie because they would risk losing

10 their jobs and being prosecuted for perjury.  <u>United States v. Weatherspoon</u>, 410 F.3d 1142, 1146

11 (9th Cir. 2005), or suggested that if he had "done anything wrong in this trial" he would not be

12 there because the court would not allow it to happen.  <u>United States v. Smith</u>, 962 F.2d 923, 934

13 (9th Cir. 1992).

14       Not every use of the personal pronoun during argument constitutes vouching:

15 when the prosecutor merely uses a phrase such as "we know," "I believe" or "I submit" to

16 marshal the evidence introduced at trial and the inferences to be drawn by that evidence, there is

17 no impropriety.  <u>United States v. Bentley</u>, 561 F.3d 803, 811-12 (8th Cir. 2009), <u>petition</u> <u>for</u> <u>cert</u>.

18 <u>filed</u>, __ U.S.L.W. __ (U.S. June 17, 2009) (No. 08-11005); <u>United States v. Younger</u>, 398 F.3d

19 1179, 1191 (9th Cir. 2005); <u>Hall v. Scribner</u>, 619 F.Supp.2d 823, 840 (N. D. Cal. 2008).

20       In this case, as the Court of Appeal recognized, the prosecutor mentioned his

21 responsibility to prove the case beyond a reasonable doubt and his belief that he had borne that

22 burden only near the end of his argument, which had laid out the evidence and its inferences.

23 Indeed, immediately before the challenged statement, the prosecutor had discussed evidence

24 suggesting petitioner was not so impaired by his mental illness or the circumstances that he was

25 unable to premeditate and deliberate.  <u>See</u> RT 481-484.  When the prosecutor argued he had

26 carried his burden of proof, he did not suggest that the jury accept the testimony of a witness

because of the prosecutor's own integrity or because of some known but not presented

information supporting credibility.  His statements did not infect the trial with unfairness.

IV.  Sentencing Error (Ground Two)

        A.  Background

        Voluntary manslaughter in California is punishable by a term of three, six or

eleven years in state prison.  Cal. Penal Code § 193.  At the time of the sentencing in this case,

California Penal Code § 1170(b) provided in relevant part that "the court shall order imposition

of the middle term, unless there are circumstances in aggravation or mitigation of the crime."

Under California's Determinate Sentencing Law (DSL) at that time, the sentencing court

imposed the middle term unless it found aggravating or mitigating factors relating to the offender

or the offense and stated the factors supporting the upper or lower term on the record.  People v.

Sandoval, 41 Cal.4th 825, 836 (2007).  Then and now, a single aggravating factor is a sufficient

basis for the imposition of the upper term.  People v. Black, 41 Cal.4th 799, 813-15, 62 (2007)

(Black II ), cert. denied, 128 S.Ct. 1063 (2008).

        The probation report prepared in this case recommended the upper term because

the crime involved great violence, petitioner took advantage of a position of trust to commit the

crime, the violence suggests that petitioner was a danger of society, and petitioner was on

informal probation when the crime was committed.  CT 449-450 (pages 18-19 of the probation

report); see generally Cal. Rules of Court, Rule 4.421.

        At the sentencing hearing in this case, the trial court selected the upper term for

the manslaughter conviction.

> . . . [T]he aggravating factors in this case outweigh the mitigating
> factors in this case.  Mr. Tinker stabbed Mrs. Tinker approximately
> thirty-seven times and left the knife fully buried in her chest.  And I
> am persuaded from the evidence I heard that the reason he did not
> stab her again might be because he was too tired from stabbing her
> the prior thirty-seven times.

/////

1    I think that she was vulnerable.  There is substantial difference in
     height, weight, strength.  And as I indicated, I have considered
2    these considerations.

3    I have considered Mr. Tinker's insignificant prior record of
     criminal conduct.  I have considered the mental condition that he
4    may have suffered for at the time of the killing.

5    I have weighed those against the nature and style of this crime that
     does involve a high degree of cruelty, viciousness and callousness.
6    The crime is violent conduct which does indicate a serious danger
     to society because there is no indication even at this point that the
7    mental problem that he is suffering for may not reoccur and cause
     him to re-offend and cause him to seriously hurt someone within
8    the community.

9    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

10   You are sentenced to the high term in State Prison of eleven years.
     The high term is selected based upon all those–eleven years based
11   upon the aggravating factors that have been just stated into the
     record.  Each and every one of them on page eighteen, lines five
12   through eleven are separate and distinct reasons for the high term
     of eleven years.

13

14   RT 632-633.

15          On appeal, petitioner challenged the court's imposition of the upper term based on

16   facts not charged or found by the jury, and based on what he perceived to be the trial court's

17   improper dual use of facts to support the upper term and incorporation of the probation report as

18   support for the sentence.  Lodg. Doc. 1 at 26-50.  However, in the petition for review filed in the

19   California Supreme Court, petitioner raised only the challenge to the court's reliance on facts not

20   found by the jury to impose the upper term.  Lodg. Doc. 4 at 4.

21          B.  Apprendi, Blakely and Cunningham

22          Beginning in 2000, the United States Supreme Court issued a series of decisions

23   which altered the way in which criminal sentences are imposed and reviewed.

24          In Apprendi v. New Jersey, 530 U.S. 466 (2000), the court held that, other than

25   the fact of a prior conviction, "any fact that increases the penalty for a crime beyond the

26   prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable

10

1  doubt." Id. at 490.  Next came Blakely v. Washington, 542 U.S. 296, 303 (2004), in which the

2  court held that the "statutory maximum for Apprendi purposes is the maximum sentence a judge

3  may impose solely on the basis of the facts reflected in the jury verdict or admitted by the

4  defendant."  Accordingly, when petitioner's conviction was on direct appeal in 2005, Supreme

5  Court authority suggested, but had not held, that California's DSL sentencing scheme was

6  subject to constitutional restraints.

7          The Court of Appeal did reject petitioner's constitutional challenge to the

8  imposition of the upper term:

9          Assuming *Blakely* applies to California's determinate sentencing
           scheme and defendant has not forfeited the issue by failing to
10         object, as the People contend, we find any *Blakely* error in this case
           harmless beyond a reasonable doubt. The overwhelming evidence
11         presented at trial established that Beth was particularly vulnerable
           when defendant killed her. At the time of her death, Beth was five
12         feet five inches tall and weighed 159 pounds. Defendant, on the
           other hand, was six feet two inches tall and weighed approximately
13         307 pounds. Moreover, no evidence was presented that anybody
           else was at the Tinker residence at the time Beth was killed,
14         leaving her alone to defend against a man who was substantially
           bigger in both height and weight. We have no doubt that if the
15         issue had been presented to a jury, it would have found beyond a
           reasonable doubt that Beth was particularly vulnerable. Since one
16         valid factor in aggravation is sufficient to expose defendant to the
           upper term, the trial court's consideration of other factors in
17         deciding whether to impose the upper term did not violate the rule
           of *Apprendi* and *Blakely*.

18

19  Lodg. Doc. No. 3 at 12-13 (internal citation, footnote omitted).

20          Shortly after the Court of Appeal denied petitioner's direct appeal, the California

21  Supreme Court rejected an Apprendi-Blakely Sixth Amendment challenge to the DSL.  The court

22  held that the discretion afforded to a sentencing judge in choosing a lower, middle or upper term

23  in a DSL case rendered the upper term under California law the "statutory maximum" within the

24  contemplation of Apprendi and Blakely.  People v. Black, 35 Cal.4th 1238, 1257-61 (2005)

25  ("Black I" ), cert. granted and judgment vacated, 549 U.S. 1190 (2007).  Black was the law in

26  California when the California Supreme Court denied petitioner's petition for review "without

1  prejudice to any relief to which defendant might be entitled upon finality of *People v. Black*

2  (2005) 35 Cal.4th 1238 . . . ."  Lodg. Doc. 5.

3              While the instant petition has been pending, the United States Supreme Court

4  decided Cunningham v. California, 549 U.S. 270 (2007).  In Cunningham, the Court held that a

5  California judge's imposition of an upper term sentence based on facts found by the judge (other

6  than the fact of a prior conviction) violated the constitutional principles set forth in Apprendi and

7  Blakely.  Cunningham expressly disapproved the holding and the reasoning of Black I, finding

8  that the middle term in California's determinate sentencing law was the relevant statutory

9  maximum for purposes of applying Blakely and Apprendi.  Cunningham, 549 U.S. at 293.

10             In the answer, filed before Cunningham was decided, respondent argues that to

11  find "a defendant has a right to have a jury determine a fact that the court uses in its discretion to

12  select a term within the lowest range specified by the defendant's crime" would establish a new

13  rule this court could not apply retroactively under the principles of Teague v. Lane, 489 U.S. 288

14  (1989).  Answer at 16.  However, the Ninth Circuit has held that Cunningham did not establish a

15  new rule of law but rather was "clearly dictated" by Blakely and so could be applied retroactively

16  to habeas cases.  Butler v. Curry, 528 F.3d 624, 628-29, 639 (9th Cir. 2008), cert. denied, __ U.S.

17  __, 129 S. Ct. 767 (2008).  Accordingly, applying the rule announced in Cunningham raises no

18  Teague concerns in this case.

19             The sentencing in this case violated petitioner's Sixth Amendment rights: none of

20  the aggravating factors upon which the court relied were charged or found to be true by the jury

21  beyond a reasonable doubt.  CT 20-21 (information), 402-404 (verdict); Butler, 528 F.3d at 643.

22             This determination does not end the inquiry, however.  The failure to submit a

23  sentencing factor to the jury is subject to harmless error analysis, which the state appellate court

24  undertook in this case.  Washington v. Recuenco, 548 U.S. 212, 222 (2006); Butler, 528 F.3d at

25  648.

26  /////

1    In order to grant habeas relief where a state court has determined that a

2  constitutional error was harmless, a reviewing court must determine: (1) that the state court's

3  decision was "contrary to" or an "unreasonable application" of Supreme Court harmless error

4  precedent, and (2) that the petitioner suffered prejudice under Brecht v. Abrahamson, 507 U.S.

5  619 (1993) from the constitutional error.  Inthavong v. Lamarque, 420 F.3d 1055, 1059 (9th Cir.

6  2005), cert. denied, 547 U.S. 1059 (2006); see also Mitchell v. Esparza, 540 U.S. 12, 17-18

7  (2003) (when a state court determines that a constitutional error is harmless, a federal court may

8  not award habeas relief under § 2254 unless that harmlessness determination itself was

9  unreasonable).  Both of these tests must be satisfied before relief can be granted and, because

10  both must be satisfied, a court need not address them in any particular order.  Inthavong, 420

11  F.3d at 1061.

12          Harmless error determinations are highly fact-specific. They often
           involve a review of the entire trial record. Under Brecht, we will
13          often make numerous independent evaluations about the weight
           and sufficiency of the various items of evidence, the inferences to
14          be drawn, and the different theories of the case. Under AEDPA, we
           simply concern ourselves with the reasonableness of the
15          evaluations and conclusions that the state court explicitly or
           implicitly made, although requiring the state court to meet the
16          more stringent 'beyond a reasonable doubt' standard.

17  Id. at 1060.  Moreover, this court's view of what is reasonable is not determinative; if the state

18  court's evaluation is also reasonable, petitioner is not entitled to habeas relief under the AEDPA.

19  Kessee v. Mendoza-Powers, 574 F.3d 675, 676 (9th Cir. 2009).

20          When a criminal defendant claims that the trial court violated his Sixth

21  Amendment rights by imposing the upper term based on facts not found by the jury, a reviewing

22  court must determine whether a properly instructed jury would have concluded beyond a

23  reasonable doubt that the sentencing factor applied to the defendant.  Sanchez, 41 Cal.4th at 842-

24  43; Butler, 528 F.3d at 648.

25          The Court of Appeal identified the harmless-beyond-a-reasonable-doubt standard

26  of Chapman v. California, 386 U.S. 18 (1967) for evaluating claims of constitutional error, and

1   found that the evidence in support of the victim's vulnerability was "overwhelming."  It relied on

2   two factors: the victim was alone with petitioner in the home at the time of the attack and the

3   victim was considerably smaller than petitioner.  Lodg. Doc. No. 3 at 12-13.  Although the Court

4   of Appeal addressed this claim of error in a cursory fashion, this court cannot say that its

5   resolution of the question was unreasonable.  Under the evaluation mandated by the AEDPA, this

6   court finds implicit in the Court of Appeal's decision its determination that the jury would have

7   found beyond a reasonable doubt that Mary Beth Tinker was "defenseless, unguarded,

8   unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act" in light

9   of her isolation in her home and the disparity in size between her and petitioner.  Butler, 528 F.3d

10  at 649.  Any such determination would not be undercut by the jury's determination that petitioner

11  committed manslaughter, not murder, a decision based on petitioner's lack of malice rather than

12  on any characteristics of the victim.  See California Penal Code § 192; In re Christian S., 7

13  Cal.4th 768, 778 (1994).  Based on the evidence presented to the jury, the Court of Appeal's

14  determination that the Apprendi–Blakely–Cunningham error was harmless did not constitute an

15  unreasonable application of clearly established federal law.

16          Petitioner has filed something he calls "Motion For En-Banc Re-Hearing For

17  Clarification For Recent Court Decision."  See Docket No. 42.  To the extent the court can

18  understand this pleading, it appears that petitioner is asking the court to apply Cunningham in

19  resolving the sentencing issue in the habeas petition.  The court has done so.

20                      C.  Incorporation Of The Probation Report And Dual Use Of Facts

21          Although the argument in support of petitioner's sentencing claim is somewhat

22  muddy, it appears petitioner is attempting to raise the claim presented in the opening brief on

23  direct appeal, but not included in the petition for review.  Compare Pet. at 11 ("petitioner is

24  incorporating pages from his opening brief, pages 46-52) and Lodg. Doc. 1 at 46-52 (section of

25  brief entitled "The trial court's commission of errors at the time of sentencing–incorporating the

26  /////

14

1  probation report and the dual use of facts–supporting the imposition of the upper term was

2  prejudicial error. . . .").

3  Respondent argues this claim is not exhausted and does not raise a federal

4  question cognizable on federal habeas.

5  The exhaustion of state court remedies is a prerequisite to the granting of a

6  petition for writ of habeas corpus. 28 U.S.C. § 2254(b)(1). A petitioner satisfies the exhaustion

7  requirement by providing the highest state court with a full and fair opportunity to consider all

8  claims before presenting them to the federal court. Picard v. Connor, 404 U.S. 270, 276 (1971);

9  Middleton v. Cupp, 768 F.2d 1083, 1086 (9th Cir. 1985), cert. denied, 478 U.S. 1021 (1986).

10  The United States Supreme Court has held that a federal district court may not entertain a

11  petition for habeas corpus unless the petitioner has exhausted state remedies with respect to each

12  of the claims raised. Rose v. Lundy, 455 U.S. 509 (1982). Generally, a mixed petition

13  containing both exhausted and unexhausted claims must be dismissed. This court may reach an

14  unexhausted claim, however, if it is perfectly clear the claim is not colorable. Cassett v. Stewart,

15  406 F.3d 614, 623-24 (9th Cir. 2005).

16  "Absent a showing of fundamental unfairness, a state court's misapplication of its

17  own sentencing laws does not justify federal habeas relief." Christian v. Rhode, 41 F.3d 461, 469

18  (9th Cir. 1994); see also Beaty v. Stewart, 303 F.3d 975, 986 (9th Cir. 2002) (imposition of

19  consecutive sentences is a matter of state law, not cognizable on federal habeas). To prevail,

20  petitioner must allege a basis for finding that the state court's violation of its own laws rendered

21  his sentence fundamentally unfair. See Cooks v. Spalding, 660 F.2d 738, 739 (9th Cir. 1981).

22  Petitioner contends only that these sentencing errors deprived him of his Sixth Amendment right

23  to be sentenced only on facts found by the jury, an argument rejected above, and, in conclusory

24  fashion, that these errors violated his rights to due process and equal protection. Because he has

25  not borne his burden of demonstrating, rather than merely asserting, that the errors denied him

26  fundamental constitutional rights, petitioner has not made a colorable claim.

1         IT IS HEREBY ORDERED that petitioner's motion for en-banc rehearing (docket

2   no. 42) is denied as unnecessary.

3         IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

4   habeas corpus be denied.

5         These findings and recommendations are submitted to the United States District

6   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

7   days after being served with these findings and recommendations, any party may file written

8   objections with the court and serve a copy on all parties.  Such a document should be captioned

9   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

10  shall be served and filed within ten days after service of the objections.  The parties are advised

11  that failure to file objections within the specified time may waive the right to appeal the District

12  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

13  DATED:  September 13, 2009.

14

15  _____

16  U.S. MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25  2 tink0726.submhc

26

16